

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed December 17, 2013**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| SUSAN MARIE LOE | § | CASE NO. 11-44598-DML-13 |
| | § | |
| DEBTOR. | § | |
| | § | |
| SUSAN MARIE LOE | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ADV. NO. 12-04108-DML |
| | § | |
| GREEN TREE SERVICING LLC, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Before the court are (1) the above-styled adversary proceeding, by which Susan Marie Loe ("Debtor" or "Plaintiff") seeks to enjoin the collection efforts of Green Tree Servicing LLC ("Green Tree" or "Defendant") and obtain damages from Defendant for allegedly violating the automatic stay in Plaintiff's chapter 13 bankruptcy case (the "Chapter 13 Case"); (2) a second adversary proceeding (No. 12-04151-dml) filed by Plaintiff against Defendant seeking similar relief for violations of the automatic stay and of the discharge injunction in Plaintiff's earlier chapter 7 bankruptcy case (Bankr. No. 03–90191–bjh7, the "Chapter 7 Case"); and (3) *Green Tree Servicing LLC's Motion for Partial Summary Judgment* (Adv. docket no.[1] 29, the "Motion"), by which Defendant requests summary judgment as to Plaintiff's claim that Defendant violated the discharge injunction in the Chapter 7 Case by filing a proof of claim in the Chapter 13 Case.[2] The court consolidated the two adversary proceedings (collectively, the "Adversary")[3] and tried them simultaneously on October 15, 2013 (the "Trial").

During the Trial the court heard testimony from multiple witnesses—including Plaintiff; Eldrick Ware, Director of Collections at Green Tree ("Ware"); and Terry Warren, an employee in Green Tree's collections department ("Warren")—and received into evidence exhibits identified as necessary below.[4] The court also admitted by deposition the testimony of Libby DeRoche, a paralegal for Plaintiff's attorney ("DeRoche"), and Richard Johnson, Jr., Plaintiff's

---

[1] "Docket no." will hereinafter refer to the corresponding docket entry in the Adversary, the Chapter 13 Case, or the Chapter 7 Case, as so identified.

[2] Based on the record on summary judgment, the court finds that a genuine issue of material fact exists as to Plaintiff's interest in Defendant's collateral at the time Defendant filed its proof of claim, which in turn affects whether the relief Defendant sought was *in rem* or *in personam*. *See Johnson v. Home State Bank*, 501 U.S. 78, 84 (1994). Accordingly, the Motion is denied, and the court will address whether Defendant violated the discharge injunction by filing its proof of claim based on the full record of evidence from the Trial. *See infra* Section II(A)(1).

[3] *Order Granting Pl.'s Unopposed Mot. to Consolidate Adversary Proceedings*, Adv. docket no. 18, at 1–2.

[4] For a list of exhibits admitted into evidence at the Trial, see Adversary docket no. 44. Exhibits will be cited as "___'s Exhibit *n*," where ___ signifies the party that introduced the exhibit and *n* signifies the exhibit number.

ex-husband ("Johnson").  The court took the Adversary under advisement and now issues the following findings of fact and conclusions of law.  *See* FED. R. BANKR. P. 7052.  These proceedings are subject to the court's core jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(O).

# I. FINDINGS OF FACT

The court, having reviewed the evidence admitted at the Trial, as well as *Plaintiff's Proposed Findings of Fact and Conclusions of Law* (Adv. docket no. 40) and *[Defendant's Proposed] Findings of Fact and Conclusions of Law* (Adv. docket no. 38), now makes the following findings of fact by a preponderance of the evidence.[5]  All findings of fact, where appropriate, may be also construed as conclusions of law, and vice versa.

*A. Pre-Collection Relationship Between the Parties*

1.    On November 18, 1997, Plaintiff and Johnson, her then-husband, signed a Retail Installment Contract (the "Note") in favor of Green Tree Financial Servicing Corporation for the purchase of a manufactured mobile home described as

> THE HOME, MANUFACTURED 09/26/1997 BY CREST RIDGE HOMES, INC., TITLE CERTIFICATE NUMBER 00949836, AND SERIAL NUMBERS CRH2TX1190A AND CRH2TX1190B, AND LOCATED ON LOT 61, SAGE MEDOWS, PHASE TWO IN DENTON COUNTY, TEXAS, ACCORDING TO THE PLAT RECORDS RECORDED IN CABINET N, PAGE 166, PLAT RECORDS, DENTON COUNTY, TEXAS, AND MORE COMMONLY KNOWN AS 11830 BUTTERCUP, JUSTIN, TX 76247

(the "Manufactured Home").  Pl.'s Exhibit 1 at 1–3; Pl.'s Exhibit 2 at 37.

---

[5] Unless noted otherwise, factual references are based on evidence presented at the Trial.  As neither party requested a transcript of the Trial, all quotes are based on the court's unofficial transcription.  Where necessary, testimony presented at the Trial will be cited as "Trial R., *w*, at *t*," where *w* signifies the witness testifying and *t* signifies the approximate time of the testimony.

2.      On or about July 26, 2002, Plaintiff was divorced from Johnson, and the 211th Judicial District Court of Denton County, Texas, entered a final divorce decree awarding Johnson the Manufactured home.  Pl.'s Exhibit 2 at 37–38.

3.      On October 23, 2003, Plaintiff filed a voluntary petition under chapter 7 of the Bankruptcy Code[6] in the Northern District of Texas.  *Voluntary Pet.*, Ch. 7 Case docket no. 1, at 1.  Plaintiff included the Note in her schedules as payable to Conseco Finance (Green Tree's predecessor-in-interest).  *Schedule D (Creditors Holding Secured Claims)*, Ch. 7 Case docket no. 1, at 9.  The remarks to the secured claim indicated Plaintiff's intention as to the secured claim was "To Surrender To Ex-Husband."  *Id.*  The clerk of the court served Defendant by first class mail on October 25, 2003 with notice of Plaintiff's chapter 7 petition.  *Notice of Ch. 7 Bankruptcy Case, Meeting of Creditors, & [sic] Deadlines*, Ch. 7 Case docket no. 3, at 3.

4.      On February 18, 2004, the bankruptcy court entered an order discharging Plaintiff's debts in the Chapter 7 Case, including the Note (the "Discharge Order").  *Discharge of Debtor*, Ch. 7 Case docket no. 9, at 1–2.  The clerk of the court served Defendant by first class mail on February 20, 2004 with notice of this order.  *Id.* at 3.  Plaintiff did not reaffirm the Note.

5.      On August 12, 2011, Plaintiff filed her voluntary petition in the Chapter 13 Case. *Chapter 13 Voluntary Pet.*, Ch. 13 Case docket no. 1, at 1–2.  Plaintiff's schedules filed along with the voluntary petition do not reference the Note or the Manufactured Home.

6.      On August 24, 2011, Green Tree filed a proof of claim in the Chapter 13 Case for secured claim of $52,943.52 accruing interest at a contract rate of 7.99% (the "Claim").  Pl.'s Exhibit 7.

---

[6] 11 U.S.C. §§ 101 *et seq.* (2006) (the "Code").

The Claim listed the Manufactured Home as collateral and "Money Loaned" as the basis for the Claim. *Id.*

7.       On August 30, 2011, Green Tree received an inbound call from Johnson on his personal phone number x1990.[7] Def.'s Exhibit D-5 at 16.[8] On the same day, the Call Notes reflect that Plaintiff called Green Tree to inquire whether Johnson would continue to receive statements now that Plaintiff had filed for bankruptcy. *Id.*

8.       On March 26, 2012, Johnson called Green Tree, again from phone number x1990, to request a payoff statement. *Id.* The Call Notes recorded Johnson's phone number (x1990) for a second time. *Id.*

9.       On April 5, 2012, Plaintiff modified the treatment of the Claim in her plan of reorganization in the Chapter 13 Case. *Debtor's Modification of Chapter 13 Plan After Confirmation*, Ch. 13 Case docket no. 34, at 2. The modified treatment was to surrender Debtor's interest in the Manufactured Home to Green Tree, and the Claim was to be paid directly by Johnson, a non-debtor third party. *Id.* One reason stated for the modification was "[t]o show that [Debtor] surrenders her interest in the [Manufactured Home] with Green Tree to [Johnson] who will continue to pay direct." *Id.*

---

[7] To balance privacy and identification concerns, these findings of fact and conclusions of law will reference phone numbers as "x*nnnn*," where "*nnnn*" is the last four digits of the relevant phone number.

[8] Adv. docket no. 36. Defendant's Exhibit D-5 is a list of notes made by Green Tree employees related to the Note (the "Call Notes"). The Call Notes paint a disturbing picture about Defendant's internal control policies as to documenting consumer bankruptcies. Employees in both the Green Tree collections and bankruptcy departments record their comments in the Call Notes. These comments are, at times, recorded in cryptic abbreviations to signify information gleaned during interactions involving the customer account. For example, while testifying at the Trial, Warren—a Green Tree collections agent who would be expected to review and understand the Call Notes *before* contacting a customer—could not decipher several of the Call Notes created by members of the bankruptcy department. Trial R., Warren, at 2:05 PM. With this explanation in mind, the court notes that translations of the Call Notes in these findings of fact and conclusions of law are the result of the court's own review and interpretations of the Call Notes based on the testimony presented at the Trial and other evidence in the record.

*B. Green Tree's Collection Procedures*

10.    As Plaintiff's case involves some systemic issues in Green Tree's procedures for contacting debtors, Defendant's internal controls for consumer bankruptcies are probative to this case.    Green Tree's Collections Manual (the "Manual") includes a procedure detailing the process employees[9] must follow regarding the automatic stay in consumer bankruptcy cases. Def.'s Exhibit D-3 at 1–3.  On the first page of these procedures—juxtaposed next to the phrase "Warning" and a bomb symbol—the Manual states: "Even with [a lift of the automatic stay], attempts to collect may constitute a willful violation of the Automatic Stay, which may subject Green Tree to actual and punitive damages, as well as attorney fees." *Id.* at 1.

11.    Before a collector can contact a debtor directly, the Manual requires that Green Tree obtain permission to speak directly with the debtor. *Id.* at 1.  This permission can come, among other ways, from the debtor's attorney directly or indirectly, if no response is received after a period following negative notice. *See id.* at 1–2.  To obtain permission from the attorney, a Green Tree bankruptcy department agent "calls the attorney to . . . [a]dvise the attorney of their client's delinquency[, d]etermine client's current intentions with respect to the collateral[, and r]equest permission to speak with the debtor to determine their intent and discuss possible Resolve Options." *Id.*

12.    If the debtor's attorney is not available, the Manual directs the bankruptcy agent to notate the account accordingly and to generate a letter to the debtor's attorney requesting permission to contact the debtor directly ("Lift of Stay Letter"). *Id.* at 2.  After sending the Lift of Stay Letter to the debtor's attorney, the Green Tree bankruptcy agent is then supposed to update the debtor's

---

[9] Although referring the Green Tree's authorized representatives as "agents," the court notes that the representatives in Green Tree's call centers are employees whose actions within the scope of their employment and are thus binding upon Green Tree. *See Bodin v. Vagshenian*, 462 F.3d 481, 484 (5th Cir. 2006).

account status to inactive (blue),[10] record when the letter was sent, and indicate when the ten-day response time expires. *Id.* Although the bankruptcy status is inactive/blue during this ten-day period, the Manual indicates the customer account continues to be marked "cease and desist"— that is, the collections department may not contact the debtor directly even in some instances when the agent's screen appears blue. *See id.* at 2.

13.     If the debtor's attorney grants permission for contact, either after the initial call or in response to the Lift of Stay Letter, Green Tree's bankruptcy department removes the cease and desist flag on the debtor's account, documents receipt of permission, and updates the account status to inactive. *Id.* at 2. Likewise, if the debtor's attorney fails to respond to the Lift of Stay Letter within ten days, permission is deemed to have been granted. *See id.* The Manual directs the Green Tree agent to remove the cease and desist flag and to notate the account to say "Okay contact debtor due to no attorney response." *Id.*

14.     If the debtor's attorney denies permission for direct contact with the debtor, the Green Tree bankruptcy department must document the account accordingly, set the account status as inactive, and activate a cease and desist flag on the account. *Id.* The Manual does not address whether, after a debtor's attorney denies permission for direct contact, the Green Tree agent can, nonetheless, generate a Lift of Stay Letter and potentially circumvent the denial using negative notice. Instead, the Manual implies negative notice is only available when the attorney cannot be reached for the initial contact regarding delinquency. *See id.* at 2.

---

[10] When an account is in bankruptcy, the Green Tree agent's screen is colored red, indicating caution. In comparison, an account for which a bankruptcy is inactive (*e.g.*, because the automatic stay has lifted) displays a blue screen. *See* Def.'s Exhibit D-3 at 2. In addition to the colors, accounts also bear notations for "C&D," meaning "cease and desist," at various times as an added layer of protection against stay violations. *Id.*

*C. Green Tree's Attempts to Collect the Note from Plaintiff*

15.     On July 5, 2012, a Green Tree agent[11] initiated the first contact with Jim Morrison, Plaintiff's attorney ("Morrison"), to obtain permission to contact Plaintiff directly. Def.'s Exhibit D-5 at 16. The Green Tree agent spoke with "Libby" at Morrison's office,[12] advising her that the Note was delinquent. *Id.* According to the Call Notes, Libby replied that (1) Debtor had surrendered the Manufactured Home per the plan modification on April 5, 2012; (2) the automatic stay in the Chapter 13 Case, which is identified in the Call Notes by case number, lifted once the property was surrendered; and (3) Green Tree was advised to contact only Morrison at phone number x9900 instead of Debtor. *Id.*

16.     Although Morrison's representative had denied permission for direct contact, the Call Notes indicate that the Green Tree agent followed the Manual's procedures for an agent who fails to reach an attorney. *Id.* Accordingly, the Green Tree agent generated a Lift of Stay Letter directed to Morrison that requested permission to contact Plaintiff directly, set the account's bankruptcy status as inactive (blue), noted when the letter was sent (July 5), and indicated when the ten-day period expired (July 15). *Id.* But the agent neither released the account to collections nor lifted the cease and desist flag. *See id.* Instead, the Call Notes state that *if* no response was received (*i.e.*, after the ten-day period expired on July 15), *then* the cease and desist flag could be removed and the account could be released to collections. *Id.*

---

[11] Although not conclusively, the Call Notes indicate that this particular agent worked in the bankruptcy department.

[12] While the "Libby" referenced in the Call Notes appears to have been DeRoche, this conclusion is not supported by DeRoche's deposition. *Compare* Def.'s Exhibit D-5 at 16, *with* Pl.'s Exhibit 16 at 5–6. The Call Notes indicate that an agent in Green Tree's bankruptcy department made the outbound call on July 5, 2012 because the Note had not yet been referred to collections. Def.'s Exhibit D-5 at 16. But DeRoche testified to not having conversations with Green Tree employees until *after* Plaintiff notified Morrison's office about the calls from Green Tree's collections department that began on July 10. Pl.'s Exhibit 16 at 5–6. Despite this inconsistency, the Call Notes clearly indicate a Green Tree employee communicated directly with Morrison's office on July 5, 2012.

17.     Despite the instructions in the Call Notes, the account for the Note was released to the collections department before the ten-day period expired on July 15—conclusively by July 10, but possibly as early as July 6, the day after the ten-day letter was generated.  *Id.*  Green Tree agents attempted to contact Johnson twice on July 6, at phone number x6479 and at another unrecorded phone number, and once on July 9, at phone number x1097.  *Id.*  It is not clear from what department these calls originated, but all of these attempts to reach Johnson were unsuccessful.  *Id.*

18.     From July 10–18, 2012, Plaintiff received a series of phone calls from two agents in Green Tree's collections departments, Warren and Mr. Romo.[13]  *Id.* at 14–16.  Although generally concurring as to the timing and the topics of these calls, the parties' evidence differs markedly as to the tenor.

19.     On July 10, 2012, Warren left Plaintiff a voicemail message regarding the Note.  *Id.* at 15.  Warren testified at the Trial that, although the account appeared colored blue on his screen (*i.e.*, bankruptcy inactive), he did not notice the note from Green Tree's bankruptcy department in the Call Notes on July 5, 2012 to direct all communications regarding the account to Morrison, Plaintiff's attorney.  Trial R., Warren, at 1:20 PM.

20.     Plaintiff returned Warren's call on July 10, at which point Warren said the account was delinquent by two weeks and asked what Plaintiff planned to do regarding payment.  Pl.'s Exhibit 11 at 1.  Plaintiff told Warren that she had divorced Johnson, that she had filed the Chapter 7 Case in 2003, and that the Note was discharged through the Chapter 7 Case.  *Id.*  Plaintiff eventually hung up on Warren.  *Id.*

---

[13] Defendant's counsel concedes that this "Mr. Romo" was not likely moonlighting as quarterback for the Dallas Cowboys while working for Green Tree.  *See* Pl.'s Exhibit 14 at 35.

21.     On July 11, 2012, Warren called Plaintiff.  At this point, Plaintiff told Warren about the pending Chapter 13 Case and attempted to give Morrison's contact information to Warren. Def.'s Exhibit D-5 at 15.  Plaintiff testified that she told Warren on this call that she would contact Johnson to let him know that Green Tree "was looking for him."  Trial R., Loe, at 9:58 AM; Pl.'s Exhibit 11 at 1.

22.     On July 13, 2012, Warren again contacted Plaintiff attempting to obtain Johnson's phone number.  Def.'s Exhibit D-5 at 15.  Later that day, DeRoche called Green Tree, speaking briefly to the bankruptcy department before being transferred to Warren.  Pl.'s Exhibit 16 at 7–9.  The Call Notes indicate that the bankruptcy department had confirmed that Plaintiff was no longer in bankruptcy and that she would continue to receive calls in regard to the past due balance until further notice.  Def.'s Exhibit D-5 at 15.  DeRoche's deposition testimony indicates that Warren, not the bankruptcy department, made these statements.  Pl.'s Exhibit 16 at 9.  Following this conversation, DeRoche faxed Green Tree a copy of Plaintiff's chapter 13 bankruptcy petition. *Id.* at 9–10.  DeRoche then called the contact number listed on the Claim but was transferred back to Warren, who said he would continue to contact Plaintiff until the bankruptcy department updated the account in Green Tree's system.  *Id.* at 10.

23.     On July 17, 2012, Warren again called Plaintiff to advise her that Green Tree's bankruptcy department had put the account back into collections.  Def.'s Exhibit D-5 at 15. Plaintiff stated she would contact her lawyer.  *Id.*

24.     On July 18, 2013, Romo called Plaintiff regarding the Note.  *Id.* at 14–15.  Romo's entries in the Call Notes indicate that Plaintiff refused to answer questions and said that she was in bankruptcy.  *Id.* at 14.  Additionally, Romo's entry in the Call Notes includes the phrase "Refused Payment."  *Id.*

25.    On the same day, Warren called Johnson and made several notes regarding the condition of the Manufactured Home.  *Id.*  Warren reached Johnson at phone number x1990—the same phone number marked in the Call Notes entries on March 26, 2011 sixteen months before Plaintiff began receiving calls requesting Johnson's phone number.  *Id.* at 16.

26.    By Plaintiff's account, on July 13 Warren "proceeded to hassle me yelling at me telling me that I did not file bankruptcy and that I was lying."  Pl.'s Exhibit 11 at 1.  Likewise, on July 11, Plaintiff characterized Warren as "very rude and bullying me stating I was lying [sic]."  *Id.*  On July 13, Plaintiff stated "[Warren] continue[d] to scream at me and wanted to know if I was going to pay the past due amount . . . ."  *Id.*  Finally, on July 17, Plaintiff said that, after telling Warren "that he was in violation of the stay," Warren said that "[h]e did not care . . . yell[ing] at me stating that he could contact me anytime . . . [t]hen he told me that he was going to send me to a collections agency."  *Id.*

27.    As to the July 18 call with Romo, Plaintiff said "Romo from Green Tree started out the phone conversation screaming at me" and "he stated that [Morrison] was lying and not telling me the truth."  *Id.*  DeRoche's disposition testimony echoed this characterization of Romo's demeanor, saying "Mr. Romo, he was rather hostile.  He was more hostile that [Warren] ever was."  Pl.'s Exhibit 16 at 15.

28.    According to Warren, the various conversations with Plaintiff were not caustic.  Instead, Warren characterized the first conversation on July 10 with Plaintiff as "cordial," and stated that he felt DeRoche was trying to "bait [him] into disagreement" on the July 13 call.  Trial R., Warren, at 1:31 PM.  Moreover, Ware, supervisor of Warren and Romo, testified that Warren's personality does not match that described by Plaintiff.  Trial R., Ware, at 10:57 AM (describing Warren as "docile" and "mild mannered").

29.    The court finds Plaintiff's assertion that "[Warren] told me that he was going to send me to a collections agency" appears to have been a misunderstanding.  *See* Pl.'s Exhibit 11 at 1. Warren worked in the collections department at Green Tree, and, according to the Call Notes, the bankruptcy department had sent the Note to the Green Tree's internal collections department, not to a third-party collections agency.  *Compare id.* at 1, *with* Def.'s Exhibit D-5 at 15.  However, this misunderstanding cannot pardon other attempts by either Romo or Warren to collect the Note by asking Plaintiff for payment during the calls from July 10–18, 2012.

30.    Although Ware initially testified at the Trial that no notation of "Refused Payment" appears in the Call Notes, thus indicating that Plaintiff was never asked for payment, Ware's testimony on cross-examination by Plaintiff's counsel established otherwise.  *Compare* Trial R., Ware, at 11:07 AM, *with id.* at 11:37 AM.  The Call Notes clearly indicate that on July 18 Plaintiff "Refused Payment," reiterated that she was in an active bankruptcy case, and requested that Green Tree stop calling her.  Def.'s Exhibit D-5 at 14.  As a result, the Call Notes alone support that Romo, at least, attempted to collect the Note.

31.    The tenor of the conversations, although likely unpleasant, did not rise to the extreme level portrayed in Plaintiff's notes on the conversations.  *See* Pl.'s Exhibit 11 at 1.  Nonetheless, the court finds Plaintiff's factual assertions as to the substance of the conversations credible— that is, Warren and Romo each tried to collect the Note and each indicated that he was free to contact Plaintiff because she was not in bankruptcy despite all evidence to the contrary.  *Id.* Accordingly, the court finds by a preponderance of the evidence that Green Tree's authorized representatives attempted to collect the Note from Plaintiff.  As previously mentioned, Green

Tree's employees' actions are binding upon Green Tree.[14]   Therefore, by extension, the court

finds by a preponderance of the evidence that Green Tree tried to collect the Note from Plaintiff.

32.     Based on the evidence presented at the Trial, the court finds that Plaintiff suffered actual

damages as a result of these collection efforts which constituted harassment in the amount of

$1000.   Additionally, Plaintiff admitted into evidence at the Trial a statement itemizing her

counsel's legal fees incurred while prosecuting the Adversary Proceeding.  Pl.'s Exhibit 17.  This

exhibit was admitted without objection.  The court finds the requested amount of $20,212.70, as

supported by the narrative entries, to have been reasonable and necessary costs.

33.     The court further finds that an award of punitive damages is justified in the Case.  Green

Tree willfully and intentionally violated orders of this court meant to protect Plaintiff and should

therefore be assessed punitive damages of $25,000, an amount the court considers sufficient to

deter similar conduct in the future.

## II. CONCLUSIONS OF LAW

### A. Violations of the Discharge Injunction

1.     Section 524 of the Code provides that an order discharging a debt in a bankruptcy case

"operates as an injunction against the commencement or continuation of an action, the

employment of process, or an act, to collect, recover or offset any such debt as a personal

liability of the debtor . . . ."  11 U.S.C. § 524(a)(2) (2006).  Prohibited actions to collect a

discharged debt include the creditor making continued phone calls to the debtor or referring the

debt to a collections agency.  *See McClure v. Bank of America (In re McClure)*, 420 B.R. 655,

659–60 (Bankr. N.D. Tex. 2009), *modified*, 430 B.R. 358 (Bankr. N.D. Tex. 2010).

2.     The congressional history of section 524 echoes these prohibitions, stating:

---

[14] *See supra* note 9.

> The injunction is to give complete effect to the discharge and to eliminate any doubt concerning the effect of the discharge as a total prohibition on debt collection efforts. This paragraph has been expanded . . . to cover any act to collect, such as dunning by telephone or letter, or indirectly through . . . harassment, threats of repossession and the like. The change is . . . intended to ensure that once a debt is discharged, the debtor will not be pressured in any way to repay it.

H.R. Rep. No. 95–595, at 363–64 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6321; S. Rep. No. 95-595, at 80 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5867.

3.      A discharge injunction is enforced with a civil contempt order. 4 COLLIER ON BANKRUPTCY ¶ 524.02[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012). A party seeking to enforce a civil contempt order must establish by clear and convincing evidence that (1) a court order was in effect; (2) the order required, or prohibited, certain conduct by the defendant; and (3) the defendant failed to comply with the court order. *Piggly Wiggly Clarksville, Inc. v. Mrs. Baird's Bakeries*, 177 F.3d 380, 382 (5th Cir. 1999) (citing *FDIC v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995)). The court may issue such orders to enforce a discharge injunction pursuant to section 105(a) of the Code, which authorizes the court to "issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *see Espinosa v. U.S. Aid Funds, Inc.*, 553 F.3d 1193, 1205 n.7 (9th Cir. 2008), *aff'd*, 559 U.S. 260 (2010) (citing *ZiLOG, Inc. v. Corning (In re ZiLOG, Inc.)*, 450 F.3d 996, 1007 (9th Cir. 2006)).

4.      An injunction created under section 524(a)(2) provides broad—but not universal— protections to a discharged debtor. Creditors may still pursue *in rem* relief against collateral even after *in personam* liability on a debt has been discharged. *Johnson v. Home State Bank*, 501 U.S. 78, 84 (1991). Yet a creditor's *in rem* rights are themselves not free from limitation. For instance, a creditor may not proceed *in rem* against a debtor's property interest if the creditor did

not have a lien before the bankruptcy case and the debtor's personal liability has been discharged. *See In re Paeplow*, 972 F.2d 730, 735 (7th Cir. 1992).

5.      Accordingly, a creditor's ability to proceed *in rem* against a debtor's collateral post-discharge requires that the creditor have a perfected security interest in the collateral. *See id.* So, for the enforcement to have been *in rem*, it follows that the debtor must have some interest in the collateral at the time of the creditor's actions. If the debtor no longer has an interest in the collateral at that time—for example, if the debtor had properly surrendered the property before collection attempts—*any* act to collect is, necessarily, *in personam* relief. Thus, an analysis of an alleged discharge injunction violation must begin with *if* a debtor possessed a property interest in the collateral and *when* the debtor so possessed that interest.[15]

6.      Here, the Discharge Order was in effect at all points during the Chapter 13 Case. The Discharge Order expressly "prohibits any attempt to collect from the debtor a debt that has been discharged," including "contact[ing the] debtor by mail, phone, or . . . [taking] any other action to collect a discharged debt from the debtor."[16] Discharge Order, Ch. 7 Case docket no. 9, at 1–2. The only remaining question is whether Defendant violated the Discharge Order, either by filing its proof of claim or by its employees' actions when contacting Plaintiff.

---

[15] The parties do not dispute that the Note reserved a perfected security interest in the Manufactured Home in favor of Green Tree. *See* Def.'s Exhibit 1 at 1.

[16] Consistent with the decision in *Johnson*, the Discharge Order also conspicuously notes that "a creditor may have the right to enforce a valid lien, such as a mortgage or security interest, against the debtor's property after the bankruptcy, if that lien was not avoided or eliminated in the bankruptcy case." Discharge Order, Ch. 7 Case docket no. 9, at 2.

*1. Defendant Did Not Violate the Discharge Injunction by Filing a Proof of Claim*

7.      Defendant did not violate the Discharge Injunction by filing the Claim in the Chapter 13 Case because, at the time the Claim was filed, Plaintiff possessed an arguable interest in the Manufactured Home.

8.      Plaintiff argues that, by filing the Claim, Defendant's pursued *in personam* relief because Defendant's basis for the Claim was "Money Loaned" and not "*in rem* relief." Moreover, Plaintiff claims that, by noting "Surrender to ex-husband" on her Schedule D in the Chapter 7 Case, she no longer had any legal or equitable interest in the Manufactured Home when she filed the Chapter 13 Case. Without such an interest, Plaintiff alleges that Defendant's attempts to collect the Note were *in personam* relief in violation of the discharge injunction.[17]

9.      Plaintiff's argument fails because her attempt to surrender her interest in the Manufactured Home during the Chapter 7 Case was ineffective. "A 'surrender' of property means that the debtor relinquishes the property *to the secured creditor*." 8 COLLIER ON BANKRUPTCY ¶ 1225.03[5] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012) (emphasis added). Plaintiff's attempted surrender in the Chapter 7 Case was to her ex-husband, a non-debtor third party. *See Schedule D (Creditors Holding Secured Claims)*, Ch. 7 Case docket no. 1, at 9. As a result, Plaintiff's discharge in the Chapter 7 Case removed only her *in personam* liability to Green Tree for the Manufactured Home, but did not otherwise affect her *in rem* liability as to whatever property interest she possessed. *See Johnson*, 501 U.S. at 84.

10.     That Plaintiff possessed some property interest in the Manufactured Home at the time of the Chapter 13 Case is evidenced by her plan modification on April 5, 2012. *See Debtor's*

---

[17] Plaintiff made the foregoing arguments in her brief opposing the Motion. *Pl.'s Br. in Supp. of Resp. to Mot. for Partial Summ. J.*, Adv. docket no. 33, at 2–3. Although the court denied the Motion, *supra* note 2, the court will treat the parties' arguments as having been renewed at the Trial.

*Modification of Chapter 13 Plan After Confirmation*, Ch. 13 Case docket no. 34, at 2. By the modification, Plaintiff amended her plan in the Chapter 13 Case shortly after Defendant filed the Claim to surrender her interest in the Manufactured Home. *Id.* The amendment stated that the new treatment for Green Tree's collateral was: "Surrender debtors [sic] Sec interest & to be paid direct by 3rd party co-debtor [sic]." *Id.*

11.     Because no surrender was properly consummated in the Chapter 7 Case, Plaintiff did possess a property interest against which Defendant could pursue *in rem* relief by filing its proof of claim.[18]    The basis for Green Tree's proof of claim was "Money Loaned"—that is, its perfected security interest in the Manufactured Home. Pl.'s Exhibit 7 at 1. Such relief is preserved under *Johnson* and the Discharge Order as enforcing a valid lien that was not avoided or eliminated in the Chapter 7 Case. Accordingly, no violation of the Discharge Injunction occurred when Defendant filed its proof of claim

*2. Defendant Did Violate the Discharge Injunction by Attempting to Collect the Note*

12.     Defendant did violate the Discharge Injunction based on the court's findings that Defendant's employees attempted to collect the Note during the various phone calls from July 10–18, 2013. *See supra* ¶¶ 30–31. Because Plaintiff surrendered her interest in the Manufactured Home by the plan modification on April 5, 2012, any attempt by Defendant to collect the Note after that date constituted *in personam* relief. Through unexplained deviations

---

[18] The court need not determine specifically *what* interest Plaintiff held in the Manufactured Home after her divorce from Johnson and the Chapter 7 Case. Instead, the testimony at the Trial and Plaintiff's plan modification demonstrate Plaintiff held at least *some* interest against which Defendant held *in rem* rights. However, even if Plaintiff held no interest in the Manufactured Home after her divorce from Johnson and the Chapter 7 Case, the result would likely be the same. Plaintiff testified at the Trial that she did not provide notice to Green Tree of her divorce proceeding or of the resulting divorce decree. Trial R., Loe, at 10:19 AM. Accordingly, Plaintiff has not likely proven by clear and convincing evidence that Defendant's actions in filing the proof of claim were not in good faith or not in accord with the Discharge Order. *See Piggly Wiggly*, 177 F.3d at 382.

from Green Tree's procedures and communication problems between Green Tree's bankruptcy and collection departments, such *in personam* relief was exercised against Plaintiff.

13.     Green Tree's systemic failures to ensure consistency between the conduct of its bankruptcy and collections departments in this case is akin to the conduct of which this court disapproved in *McClure*.  *See* 420 B.R. at 661–62 & nn.16, 19.  In that case, as in this case, one department of the creditor improperly removed the debtor's account from protected status, leading another department to believe that collecting the account was authorized.  *Id.*  The result is the same; neither creditor can "contend that it did not knowingly violate the discharge injunction because its left hand did not know what its right hand was doing." *Id.* at 662.

14.     Even more troubling is that a systemic failure of this type is not a first for Green Tree. *See Mooney v. Green Tree Servicing, LLC (In re Mooney)*, 340 B.R. 351 (Bankr. E.D. Tex. 2006).  The situation in *Mooney* is strikingly similar to Plaintiff's case.  There, a debtor had also purchased a manufactured home from Green Tree's predecessor-in-interest,[19] divorced her husband, and later filed a chapter 7 bankruptcy petition.  *Id.* at 354.  The debtor in *Mooney* scheduled her interest in Green Tree's collateral and declared her intent to surrender that interest to Green Tree.  *Id.*  Two years after the discharge order was entered in *Mooney*, Green Tree began contacting the debtor "ostensibly for the purpose of seeking information about the [d]ebtor's ex-husband." *Id.* at 355.  In that case, as in this case, the offending employee at Green Tree testified that her computer system inexplicably failed to reflect the debtor's discharge and that fully investigating Green Tree's file on the debtor would have revealed the discharge order.

---

[19] For clarity, the court refers to Green Tree and its predecessor-in-interest, Conseco Finance Servicing Corp., synonymously.

*Id.* at 355 & n.13. The court in *In re Mooney* relied on section 105(a) to award actual and punitive damages totaling over $61,000. *Id.* at 363.

15. The similarity between Green Tree's failures in the past, recorded in a published opinion, and its failures in this case weigh against the credibility of evidence presented concerning the efficacy of Green Tree's internal controls. The testimony and evidence presented the Trial prove by a preponderance of the evidence that the contact with Plaintiff by Defendant's employees went beyond attempting to locate Johnson—conduct that was itself questionable[20]—and constituted attempts to collect payment on a debt for which Plaintiff was no longer liable. This conduct aligned squarely with the conduct expressly prohibited by the Discharge Order. As a result, the court holds that Green Tree violated the Discharge Order by attempting to collect the Note after Plaintiff surrendered her interest in the Manufactured Home in the Chapter 13 Case.

### B. Violations of the Automatic Stay

16. Section 362 of the Code stays "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under [title 11]." 11 U.S.C. § 362(a)(6). To pursue remedies against its collateral after the automatic stay has arisen, a creditor must move the court to lift, modify, annul, or condition the stay. *Id.* § 362(d).

---

[20] Green Tree filed post-trial briefing on the issue of whether a creditor, after the automatic stay has been lifted, may contact a debtor without the permission of the debtor's attorney. *[Def.'s] Trial Br.*, Adv. docket no. 45, at 1. Defendant's trial brief discussed several cases from other jurisdictions, concluding that "[w]hile none of the above cases are directly on point, they each find that the Bankruptcy Code does not prevent communications between a creditor and a debtor, even if the creditor fails to obtain permission from the debtor's attorney *as long as* the communication itself is not coercive or harassing." *Id.* at 4 (citing *Garske v. Arcadia Fin., Ltd. (In re Garske)*, 287 B.R. 537, 543 (B.A.P. 9th Cir. 2002)). Defendant did not address cases from this district in which courts have expressed concern about communications directed to a debtor exclusive of the debtor's attorney after the automatic stay has been lifted. *E.g.*, *In re Law*, 497 B.R. 843, 851 (Bankr. N.D. Tex. 2013). Contacting the debtor directly, particularly after being denied permission by the debtor's attorney, is, at best, suspect conduct. However, although such conduct clearly violated Green Tree's internal policies, *see supra* ¶ 16, the contact alone with Debtor after the stay lifted in this case does not appear to have violated the stay. Only once the initial guise of locating Johnson morphed into full collection efforts was the stay violated.

17.     By General Order, the Northern District of Texas excepts a creditor from the notice and hearing requirement under section 362(d) when a debtor surrenders the creditor's collateral. *In re Amending Standing Order Concerning All Chapter 13 Cases*, Gen. Or. 2006–08, ¶ 4(e) (Bankr. N.D. Tex. Oct. 30, 2006). Specifically, General Order 2006–08 provides that "[i]f a post-confirmation modification of the Plan is filed that provides for the surrender of any Collateral, the automatic stay shall be lifted and the Trustee shall cease disbursements to the affected creditor upon the filing of the modification." *Id.*

18.     But even where the automatic stay has been lifted *as to collateral*, the automatic stay remains firmly in place *as to the debtor*. *In re Law*, 497 B.R. at 844 (awarding actual and punitive damages, as well as attorney's fees, where creditor attempted to collect a prepetition claim before discharge but after the debtor stated her intention to surrender the collateral). Accordingly, even if the automatic stay has lifted, a creditor may still be liable for willful violations of the automatic stay.[21] *Id.*

19.     Section 362(k) of the Code states that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k). "A willful violation does not require a specific intent to violate the automatic stay." *Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298, 302 (5th Cir. 2005).[22] Instead, a willful violation under section 362(k) requires three elements: "(1) the defendant must have known of the existence of

---

[21] Green Tree's Manual recognizes this protection by warning collections department agents that attempts to collect a debt after a lift of the automatic stay may result in penalties against Green Tree. Def.'s Exhibit D-3 at 1. Ware testified at the Trial several times that Green Tree's collections agents did not follow the section 362(k) procedures provided for in the Manual. *E.g.*, Trial R., Ware, at 11:15 AM.

[22] *In re Chesnut* applies the former section 362(h), which was recodified in 2005 as section 362(k).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**                           **PAGE 20 OF 22**

the stay; (2) the defendant's acts must have been intentional; and (3) these acts must have violated the stay." *Id.* Each of these elements is present in this case.

20.     Defendant knew about the existence of the automatic stay in Plaintiff's Chapter 13 Case—whether when Defendant filed the Claim, when Plaintiff repeatedly told Warren about the existence of the stay, or when DeRoche faxed a copy of Plaintiff's petition to Defendant's bankruptcy department. The actions of Green Tree's agents were unquestionably intentional. The Call Notes indicate that the offending collection calls were *outbound* calls. Additionally, Ware testified that, in the parlance of the Call Notes, the notation of "Refused Payment" means that an agent *asked* for payment and was refused. Trial R., Ware, at 11:37 AM. As already stated, such a notation appears in the Call Notes. Def.'s Exhibit D-5 at 14.

21.     Finally, Defendant violated the automatic stay for the same reasons as it violated the discharge injunction. By attempting to collect the Note after Plaintiff had surrendered her interest, Defendant exercised *in personam* action against Plaintiff in violation of the automatic stay. However, no separate damages are available for violations of the discharge injunction based on the same misconduct. Moreover, although the court may use section 105(a) of the Code to enforce a discharge injunction with a civil contempt order, no such reliance on equitable powers is necessary here because all remedies here are available through section 362(k). *See Mooney*, 340 B.R. at 361

22.     As to punitive damages under section 362(k), the Fifth Circuit has adopted the "egregious conduct" standard for "appropriate circumstances," meaning that punitive damages are available where the violator's misconduct is egregious and intentional. *Young v. Repine (In re Repine)*, 536 F.3d 512, 521 (5th Cir. 2008). As discussed above, Defendant's repeated collection efforts created appropriate circumstances to warrant punitive damages. Indeed, the *Mooney* court found

that damages were appropriate when "Green Tree did not retreat nor relent even when the illegality of its acts was exposed. Its agents continued to harass the Debtor through repeated telephonic communications in which the Debtor was erroneously advised that her personal liability on the debt remained intact . . . ." *Mooney*, 340 B.R. at 361 (awarding punitive damages pursuant to 11 U.S.C. § 105(a) for a willful violation of a discharge injunction).

23.     Moreover, the court holds that Plaintiff's actual damages support an award of both punitive damages and attorney's fees. *See Young*, 536 F.3d at 521–22. When awarding punitive damages, bankruptcy courts are guided by the principles of reasonableness expressed in *BMW of North America Inc. v. Gore*, 517 U.S. 559 (1996), and *Lincoln v. Case*, 340 F.3d 283 (5th Cir. 2003).

24.     Accordingly, the court awards actual damages in the amount of $1000 and punitive damages in the amount of $25,000. Additionally, pursuant to the language of section 362(k), the court awards reasonable attorney's fees in the amount of $20,212.70. Plaintiff's counsel is directed to upload a judgment consistent with these findings of fact and conclusions of law.

### END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW ###